J-A27043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.P. AND J.B., PARENTS | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1096 MDA 2023 |

Appeal from the Decree Entered July 6, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9399

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED FEBRUARY 09, 2024**

Appellants, B.P. ("Mother") and J.B. ("Father") (collectively "Parents") appeal from the July 6, 2023 decrees, entered in the Court of Common Pleas of Luzerne County, terminating their parental rights to their daughter, H.R.B. ("Child"), born in January 2015, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We affirm.

In January 2020, Parents brought Child to the Hazleton City Police Department after she alleged that her older half-brother, D.B., sexually abused her. Notes of Testimony ("N.T."), 2/28/2023, at 20, 23. At that time, officers put the case on hold to evaluate five-year-old Child.  As the officers were not confident that Child was competent in making these allegations,

_____

[*] Former Justice specially assigned to the Superior Court.

Child was released to Parents' care, but the family was placed under CYS supervision. *Id.* at 18-19, 24.[1] Thereafter, Luzerne County Children and Youth Services ("CYS") implemented a safety plan that required Parents to supervise any contact between Child and D.B. *Id.* at 52.

On March 4, 2020, CYS received another referral alleging that Child was sexually abused by D.B. again. *Id.* at 37. Child was removed from Parents' home and, in April 2021, placed in the care of her maternal uncle and aunt ("Kinship Mother"), where Child has remained. *Id.* at 4, 37. Thereafter, Child began therapy and was diagnosed with unspecified trauma and stressor related disorder, ADHD, and confirmed child sexual abuse. *Id.* at 30. Further, at the time of her placement with Kinship Mother, Child was behind educationally at six years old and had to repeat kindergarten. *Id.* at 5.

Following Child's removal, Parents were charged with endangering the welfare of a child. *Id.* at 19. CYS developed a permanency plan requiring Parents to attend a parenting course, participate in mental health services, attend supervised visitation and participate in family counseling with Child. *Id.* at 38-39. Parents mostly completed these services.[2] *Id.* at 39. However, Parents continued to deny Child's allegations of abuse. *Id.* at 41.

---

[1] Detective Corporal Brett Naprava shared that her concern that Child was not competent in her allegations, pointing to Child's statement that she believed the characters from Paw Patrol cartoon were real.  N.T. at 18-19.

[2] Parents participated in visits with Child approximately three times per week. N.T. at 5-6.  However, in September 2021, the juvenile court discontinued the
*(Footnote Continued Next Page)*

On October 3, 2022, CYS filed petitions for the involuntary termination of Parents' parental rights to Child pursuant to 23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b). The orphans' court conducted an evidentiary hearing on February 6, 2023, when Child was eight years old.[3] CYS presented the testimony of Kinship Mother; Corporal Brett Naprava, detective with the Hazleton City Police Department; Theresa Sears, clinical program manager for KidsPeace and Child's therapy provider; Sherri Hartman, CYS caseworker; Jessica Timek, CYS supervisor; and Rose Kelly, court appointed special advocate ("CASA"). Parents were represented by counsel but did not testify.

By decrees entered on July 7, 2023, the orphans' court involuntarily terminated Parents' parental rights to Child pursuant to 23 Pa.C.S.A § 2511(a)(2), (5), (8), and (b). Parents filed a timely notice of appeal along with concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[4]  In response, the orphans' court filed its Rule 1925(a) opinion on September 1, 2023.

_____

visitation in light of the criminal court's order proceedings that, as best we can discern, prohibited contact between Parents and Child.  *Id.* at 11.

[3] On October 3, 2023, the orphans' court appointed Corbett Price Law, LLC, as Child's legal counsel and guardian *ad litem* ("GAL").  The certified record confirms that the Child's legal and best interests do not conflict.  *See* N.T. at 31, 42, 63, 70-72; *see also* 23 Pa.C.S.A. § 2313(a); *In re K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" concerning a child's statutory right to counsel in the termination context).

[4] Filing a single notice of appeal from multiple orders is discouraged.  *General Electric Credit Corporation v. Aetna Casualty and Surety Company*, 263
*(Footnote Continued Next Page)*

On appeal, Parents raise the following issues:

1. Whether the court erred and/or abused its discretion in terminating Parents' parental rights with respect to 23 Pa.C.S.A § 2511(a) of the Adoption Act?

2. Whether the court erred and/or abused its discretion in terminating Parents' parental rights with respect to 23 Pa.C.S.A. § 2511(b) of the Adoption Act?

Parents' Brief at 5 (cleaned up).

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

_____

A.2d 448 (Pa. 1970) (one appeal from several judgments is discouraged as unacceptable practice and Supreme Court has quashed such appeals where no meaningful choice between them could be made). However, our Supreme Court has held in **K.H. v. J.R.**, 826 A.2d 863 (Pa. 2003):

Where a party specifies a particular part of a judgment or order in their notice of appeal, appellate review may nevertheless be extended to orders not identified in the notice of appeal if the specified and unspecified orders are connected, the intention to appeal the unspecified order is apparent, and the opposing party has not suffered prejudice and has had an opportunity to brief the issues.

**Id.** at 871. Instantly, the court terminated Parents' parental rights to Child by separate decrees, but Parents filed only one notice of appeal. However, the notice of appeal demonstrates Parents' intention to appeal both decrees. In addition, no party has asserted any prejudice as a result of Parents filing a single notice of appeal and each had an opportunity to address the issue. Thus, we observe no impediment to our appellate review of the case at bar.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection of [Section] 2511(a),

in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Id.*

In the case *sub judice*, the orphans' court terminated Parents' parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Instantly, we will analyze the court's termination decrees pursuant to Section 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that:

(1) the child has been removed from the parent's care for at least 12 months;

(2) the conditions which led to the removal or placement still exist; and (3)

termination of parental rights would best serve the needs and welfare of the child. ***In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa.Super. 2018). Furthermore, termination pursuant to Section 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal or placement of the child. ***In re M.A.B.***, 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa.Super. 2009). This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

***Id***. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

Initially, it is undisputed that Child has been removed from Parents' care for the requisite twelve months. In concluding that CYS satisfied the second prong of Section 2511(a)(8), the court emphasized Parents' disbelief of Child's allegations against her older half-brother, as follows:

> The conditions that led to [C]hild's removal from [Parents'] care and into placement were: [Child] being inappropriately touched by her half-brother for the second time and [P]arents' failure to properly protect [C]hild by failing to properly supervise [C]hild's half-brother[]. Despite [P]arents engaging in services, [P]arents failed to benefit from the services by still lacking the capacity to emotionally protect [C]hild and make her feel safe. [P]arents refused to believe that [C]hild was inappropriately touched by her half-brother despite Father having the knowledge that his son inappropriately touched his younger brother in the past.
>
> The [c]ourt has performed the above extensive analysis in taking testimony and finding credible evidence in concluding that [Parents] did not benefit from the required services. Therefore, the conditions that gave rise to placement continue to exist.

Orphans' Court Opinion ("O.C.O."), 9/1/2023, at 25.

Parents argue that the conditions for Child's placement are unclear because following Child's initial allegations the police "did not believe there was any reason for concern" and Child was not removed until after a subsequent referral. Parents' Brief at 16. Parents further contend that they successfully completed all services and participated in almost all supervised visits until the juvenile court discontinued visitation in September 2021, as discussed above. *Id.* at 19. Parents posit that their inability to see Child prevented them from demonstrating that they understood the circumstances that led to Child's removal. *Id.* at 19-20.

Initially, Parents' argument that the conditions leading to Child's removal are unclear is without merit. Following this assertion, Parents proffered that "the circumstances that led to [Child's] placement were the allegations of abuse by a [half-]brother . . . ." *Id.* at 19. By their own arguments and the certified record, it is clear that Parents were fully aware of the circumstances that caused Child's removal, *i.e.*, Child's allegations of sexual abuse committed by her older half-brother. *See* N.T. at 39 ("[P]arents had violated a safety plan that had been set up. They had allowed the half[-]brother around [Child] after she disclosed that he was inappropriately touching her"). Additionally, Detective Naprava emphasized that although the criminal case was put on hold following Child's initial allegations in January 2020, CYS began supervising the family and implemented a safety plan at that time. *Id.* at 24.

Further, Parents' argument that their completion of required services resolved the conditions which led to removal is unavailing. Throughout Child's dependency, Parents have consistently stated that they did not believe Child had been sexually abused by her half-brother. Kinship Mother testified that she observed Child as she tried to engage Parents regarding what happened, but Parents were unsupportive, as follows:

Q: And were there any concerns with the visits?

A: Yes.

Q: What were those concerns?

A: As [Child] would engage with them in the visits in the beginning, I slowly started seeing a deterioration as [Child] was speaking more about the trauma that she endured before she came to our house. Parental responses would be, especially from [Mother], that that's not nice to say. You're making me cry. [Mother was] unsupportive in her reaction to [Child's] explanations of what would happen to her during her trauma. She wasn't very supportive.

Q: So I'm going to ask you to be a little bit specific when you're talking about what [Child] was discussing. Can you tell the [c]ourt what she was discussing at those times?

A: Yes. She was saying that [her half-brother] had touched her inappropriately on two separate occasions, once in the bedroom, once in the bathroom. And she was telling [Parents] how that made her feel. And the responses weren't supportive at all.

Q: Can you remember what the responses were?

A: You're making me cry. That's not nice to say.

Q: And who made those responses? Was it just [M]other or both [P]arents?

A: [Mother]; [Father] wouldn't say anything at all.

*Id.* at 6-7.

Ms. Hartman, CYS caseworker, reiterated that Parents' inability to believe Child presented ongoing safety concerns, as follows:

Q: So as we sit here today, what is the ongoing safety concern?

A: The ongoing safety concern is [P]arents' lack of protective capacity. Due to their lapse in judgment, there is an insufficient protective capacity. [P]arents violated a safety plan, which was designed to prevent contact between the siblings. That contact [occurred] two times.

Q: And what are your concerns today? I understand the safety plan had occurred and that was broken. What are your concerns today?

- 10 -

A: When I met with [P]arents, [they] stated that they do not believe that the incidents occurred.

. . .

Q: Have [P]arents rectified the issues that led to [Child's] placement?

A: No.

Q: Why do you say that?

A: [C]hild -- even though -- [P]arents did parenting. They did mental health services. The issue was the safety of [C]hild. And [P]arents failed to keep [C]hild safe. [P]arents' lack of accepting what [Child] had to say still would place [her] at risk.

Q: Can you explain that a little bit more?

A: If [P]arents don't believe that -- what [C]hild said, that she's been sexually abused, then if [C]hild went home, there is a high risk of [it happening] again.

*Id.* at 39-40, 42.

Ms. Hartman further testified that Parents obtained a protection from abuse ("PFA") order against D.B., which included Child, in September 2021. *Id.* at 44. However, Ms. Hartman proffered that Parents only obtained the PFA after D.B. attacked Mother. *Id.* at 44-45 ("My understanding was that the PFA was -- that it was more for [P]arents. When the referral had come in, [D.B.] had attacked [Mother]. After that, she did go and get a PFA."). Due to Parents' ongoing insistence that Child was not sexually abused, Ms. Sears testified that Child "express[ed] that she did not feel that [Parents] listened to her or protected her or were able to keep her safe." *Id.* at 31.

The record is clear that although Parents participated in the required services, they did not gain the insight required to protect or support Child. The orphans' court's findings are well supported by the record, and we discern no error regarding the second prong of Section 2511(a)(8).

Regarding the final prong of Section 2511(a)(8), Parents do not submit any cohesive argument to challenge the orphans' court's determination that termination of parental rights best serves the needs and welfare of the child. Rather, Parents baldly state that they were unable to care for Child following the cessation of visitations. Nevertheless, we will review the sufficiency of the orphans' court's findings out of an abundance of caution.

In concluding that termination of Parents' parental rights would best serve the needs and welfare of Child, the orphans' court relied on the testimony of Ms. Kelly, Kinship Mother, Ms. Sears, and Ms. Hartman. Ms. Kelly testified that, based upon her observations as Child's CASA, it is in Child's best interest for Parents' rights to be terminated. N.T. at 72-73. She further stated that Child loves her kinship family, who are a pre-adoptive resource, and she feels safe with them. *Id.* at 71.

Ms. Hartman reported that Child has explicitly expressed that she does not desire further contact with Parents. *Id.* at 63 ("[Child] states that ... she does not want to return to [Parents'] home; that she does not feel safe and she is concerned that … she could possibly get hurt again in their home."). According to Ms. Hartman, Child has assimilated well with her kinship family

who are extremely supportive of her. *Id.* at 60-61 ("She participates in family activities with the immediate and extended family. There are family pictures of her all over. … [T]hey let her decorate her own room. … They wanted [] to make sure that she was part of the family.").

Kinship Mother testified that although Child was behind in her educational development when she was first placed with the family in April 2021, she has since caught up. *Id.* at 5. Additionally, although Child was insecure and sad when she first arrived, Kinship Mother indicated that Child is now outgoing, happy, and secure. *Id.* Further, Ms. Sears testified that Child's participation in therapy helped Child develop a consistent positive self-image, taught Child how to form healthy attachments, and educated Child on how to communicate clearly and regulate her emotions. *Id.* at 29. Overall, we observe no abuse of discretion or error of law in the orphans' court's conclusion that the third prong of Section 2511(a)(8) was satisfied.

Based on the foregoing, the orphans' court was well within its discretion to terminate Parents' parental rights under Section 2511(a)(8) because Child had been removed from their care in excess of the twelve-month statutory minimum, the conditions which led to Child's removal continue to exist, and termination would best serve the needs and welfare of Child.

Having determined that there are sufficient grounds for termination pursuant to at least one subsection of Section 2511(a), we now turn to Section 2511(b), which affords "primary consideration" to "the developmental,

- 13 -

physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). In *Interest of K.T.*, 296 A.3d 1085 (Pa. 2023), our High Court held:

> a court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*Id.* at 1113 (emphasis added). In addition, the *K.T.* Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." *Id.* While not inventing an exhaustive list of considerations, the Court explained that the inquiry must consider and weigh certain evidence if it is present in the record, including, but not limited to,

> the child's need for permanency and the length of time in foster care consistent with 42 Pa.C.S.[A.] § 6351(f)(9); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id*. (footnote omitted). *See also id.* at n.28.

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted). Nevertheless, "the mere existence of a bond or attachment of a child

to a parent will not necessarily result in the denial of a termination petition." ***T.S.M.***, ***supra*** at 267. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. Specifically, we have observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Parents argue that CYS failed to prove that severing Child's bond with Parents would not be detrimental for her. Parents' Brief at 21-22. Parents contend that they share a "strong and loving" bond with Child. ***Id.*** at 22. Parents baldly assert that they did everything they could to ensure the safety of Child. ***Id.***

In determining that termination of Parents' parental rights favors Child's needs and welfare under Section 2511(b), the orphans' court reemphasized its extensive findings related to Parents' inability to believe Child's allegations and the kinship family's secure and loving bond with Child. O.C.O., 9/1/2023, at 26-27. We discern no error.

Primarily, other than Parents' bald assertions, no real evidence was presented that Parents and Child share a bond. Ms. Hartman testified that Child does not share a bond with either Parent. ***Id.*** at 62-63. As related *supra*, Child wants no contact with Parents and wants to stay with her pre-adoptive kinship family, where she feels safe, secure, and loved. ***Id.*** at 60-63. Ms.

Hartman testified on direct examination regarding the kinship family, as follows:

> Q: And who has been providing for Child's physical needs?
>
> A: [Kinship parents].
>
> Q: How so?
>
> A: They provide clothing, food, and shelter.
>
> Q: And do they take her to doctors' appointments?
>
> A: They take her to doctors' appointments, her medical. Up until she was discharged from KidsPeace and Children's Service Center, they ensured that all of those appointments were kept as well.
>
> Q: What about her developmental needs; who meets those?
>
> A: [Kinship Mother] has spent a lot of time helping [Child] with her developmental needs. She was a little behind. She didn't know her numbers. She didn't know any of that. But she spent a lot of time get her up to where she is at now.
>
> She worked with her also on [learning] normal kids' reactions, normal kids' behavior.
>
> . . .
>
> Q: Who's meeting her emotional needs?
>
> A: The kinship parents. They are very supportive of her. They listen to her. They show her the affection she seeks. [Child] likes to hug. She likes to cuddle. They're always there for her no matter what.

*Id.* at 61-62. Accordingly, the orphans' court did not abuse its discretion in determining that termination best serves the Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Based on the foregoing, we affirm the orphans' court's decrees involuntarily terminating Parents' parental rights to Child pursuant to Section 2511(a)(8) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/09/2024